**UNITED STATES DISTRICT COURT**

**DISTRICT OF ALASKA**

| | |
|---|---|
| NINILCHIK TRADITIONAL COUNCIL and DAVID F. COOPER, JR.,     ) ) ) | |
| Plaintiffs,     ) ) | 3:06-cv-213 JWS |
| vs.     ) ) | ORDER AND OPINION |
| MICHAEL R. FLEAGLE, Chairman, Federal Subsistence Board; DIRK KEMPTHORNE, Secretary of the Department of the Interior; and MIKE JOHANNS, Secretary of the Department of Agriculture,     ) ) ) ) ) ) ) ) | [Re:   Motion at Docket 4] |
| Defendants.     ) ) | |

## I.  MOTION PRESENTED

At docket 4, pursuant to Section 807[1] of the Alaska National Interest Lands

Conservation Act ("ANILCA"),[2] plaintiffs Ninilchik Traditional Council and its president,

David F. Cooper, Jr., ask the court to issue a preliminary injunction requiring the

defendants, Michael R. Fleagle, Chairman of the Federal Subsistence Board; Dirk

Kempthorne, Secretary of the Interior; and Mike Johanns, Secretary of Agriculture, to

provide residents of Ninilchik an opportunity to take silver salmon on a portion of the

---

[1]16 U.S.C. § 1317.

[2]Publ. L. 96-487, Dec. 2 1980.

Kasilof River for subsistence use in accordance with Section 804 of ANILCA.[3]
Defendants have opposed the motion. Oral argument was heard on September 19,
2006.

## II. BACKGROUND

On September 11, 2006, plaintiffs commenced the instant action seeking
declaratory and injunctive relief with respect to the Federal Subsistence Board's
activities related to the subsistence taking of fish from waters on the Kenai Peninsula.
Plaintiffs allege that defendants have violated ANILCA, the Administrative Procedure
Act ("APA"),[4] and the National Environmental Policy Act ("NEPA").[5] The court has
subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

Congress enacted ANICLA in 1980 for several purposes,[6] one of which was to
allow rural Alaskans to engage in a subsistence way of life in a manner consistent with
the scientific management of fish and wildlife populations.[7] Consistent with that
purpose, Congressional policy set out in ANILCA requires utilization of Alaska's public
lands in a manner which causes the least possible adverse impact on the subsistence
use of those lands,[8] and elevates the non-wasteful taking of fish and wildlife above all
other consumptive uses of such resources.[9] Consistent with that policy, Congress
ascribed priority for the harvest of fish and wildlife from public lands in Alaska to non-

---

[3]16 U.S.C. § 3114.

[4]The principal provisions of the APA as amended are codified at 5 U.S.C. § 551 *et seq.*
and § 701, *et seq.*

[5]42 U.S.C. § 4231, *et seq.*

[6]16 U.S.C. § 3101.

[7]16 U.S.C. § 3101(c).

[8]16 U.S.C. § 3112(1).

[9]16 U.S.C. § 3112(2)

-2-

wasteful subsistence uses.[10]  ANILCA defines "subsistence use" to be the customary and traditional uses of fish and wildlife by rural residents of Alaska.[11]

Following passage of ANILCA, the State of Alaska enacted laws providing for the enforcement of a subsistence use priority on public lands in Alaska, but in 1989 the Alaska Supreme Court held that the priority for rural residents violated the Constitution of the State of Alaska which provides for the common use of such resources by all Alaskans.[12]  When the state ceased to enforce a subsistence priority, the task became the responsibility of the federal government.[13]

The federal officials responsible for administration of ANILCA's provisions regarding subsistence use are the Secretary of the Interior and, as to lands within National Forests, the Secretary of Agriculture, who are jointly referenced in the statute as "Secretary."[14]  Congress authorized the Secretary to adopt regulations necessary to carry out his responsibilities with respect to subsistence use.[15]  "Subsistence Management Regulations for the Public Lands in Alaska" have been adopted by the Secretary and published in the Code of Federal Regulations.[16]

Congress directed the Secretary to divide the public lands in Alaska among at least six subsistence resource regions within which there were to be so many local advisory committees as might be necessary and for each of which there was to be one regional advisory council ("RAC") with powers enumerated by Congress.[17]  The Secretary created the Federal Subsistence Board ("Board") and delegated to the Board

---

[10]16 U.S.C. § 3114.

[11]16 U.S.C. § 3113.

[12]*McDowell v. State of Alaska*, 785 P.2d 1 (Alaska 1989).

[13]16 U.S.C. § 3115.

[14]16 U.S.C. §§ 3102 (12), 3115.

[15]16 U.S.C. § 3124.

[16]50 C.F.R. § 100.1, *et seq.* (2005).

[17]16. U.S.C. § 3115(a).

-3-

his authority over subsistence use of fish and wildlife, including the authority to promulgate regulations.[18]  The Board is composed of a chair appointed by the Secretary and the holders of five specified federal offices within the Departments of the Interior and Agriculture.[19]

The Board has recognized ten subsistence resource regions, one of which is the Southcentral Region,[20] which extends over a broad expanse, including the Kenai Peninsula.  The Ninilchik Traditional Council is the governing body of Ninilchik Village, a federally recognized Indian tribe whose members mostly reside on the Kenai Peninsula and some of whom reside in the village of Ninilchik.[21]  During the Board's 2000-2001 regulatory cycle, the Ninilchik Traditional Council and other residents of Ninilchik asked the Board to make a customary and traditional use determination for salmon and fresh water fish on the Kenai Peninsula and to implement a subsistence fishery for fresh waters in the Cook Inlet Area.  The proposals were deferred until completion of a study entitled *Cook Inlet Customary and Traditional Subsistence Fisheries Assessment* in 2004.[22]

At its meeting in January 2006, the Board determined that residents of Ninilchik have customarily and traditionally harvested fish, including silver salmon, from the waters of the Kasiloff River within the Kenai National Wildlife Refuge.[23]  However, the Board made no provision for a subsistence fishery at that time.  Dissatisfied with the failure to create a subsistence fishery, the Ninilchik Traditional Council sent a  Request For Reconsideration of the January decision to the Board in May of 2006.[24]  That

---

[18]50 C.F.R. § 100.10(a) (2005).

[19]50 C.F.R. § 100.10(b) (2005).

[20]50 C.F.R. § 100.22(a) (2005).

[21]Doc. 6, Ex. P.

[22]Doc. 6, Ex. B at 194, 229.

[23]71 F.R. 15574, March 29, 2006.

[24]Doc. 6, Ex. A.

Case 3:06-cv-00213-HRH   Document 18   Filed 09/20/06   Page 4 of 17

request, which the Board has accepted in part but has not yet decided, is not the subject of this order.

Following a public meeting held in Ninilchik on July 26, 2006, the Ninilchik Traditional Council presented a Request for Special Action to the Acting Chair of the Board in a letter dated August 2, 2006. The immediate objective was creation of a subsistence harvest to open as soon as possible and to continue through the autumn of 2006.[25] In subsequent correspondence,[26] counsel for the Ninilchik Traditional Counsel, set out details of a temporary subsistence fishery, proposing a dip net fishery on the Kasilof River targeting coho salmon with a daily permit limit of 20 fish and a total harvest limit of 500 fish.[27] The request was considered by federal fisheries biologists and by the Southcentral RAC, which unanimously endorsed it and recommended it to the Board.[28] The recommendation by the Southcentral RAC was considered at a Board meeting on September 5, 2006.[29]

Plaintiffs have provided a transcript of the September 5, 2006, meeting which has been relied upon by both parties.[30] The transcript shows that when the meeting was called to order, the Chairman, defendant Michael Fleagle, introduced himself to those present, explained that he had been recently appointed, and stated that the September 5 meeting was his first.[31] Following an opportunity for all those present to identify themselves, Chairman Fleagle determined that some members of the public who were

---

[25]Doc. 6, Ex. F.

[26]Doc. 6, Ex. G.

[27]The terms "coho salmon" and "silver salmon" are synonyms referring to one of the five commonly recognized species of Pacific salmon. In Southcentral Alaska, the movement of silver salmon into freshwater begins in some water systems as early as mid-summer and may be on-going in some drainages until early winter.

[28]Doc. 6, Ex. K, Ex. Q at p. 35.

[29]Doc. 6, Ex. Q. See in particular p. 36.

[30]The transcript is Ex. Q to doc. 6. At oral argument counsel for defendants indicated that the court could rely on plaintiff's exhibits as the record to be considered by the court.

[31]*Id.* at p. 2.

Case 3:06-cv-00213-HRH   Document 18   Filed 09/20/06   Page 5 of 17

present wished to be heard, so he passed around a sheet to be signed by those wanting to speak.[32]

Next, Chairman Fleagle asked a staff member to describe the information contained in the packets provided to the Board.[33]  That prompted a question from the audience posed by Wayne Regelin with the State Department of Fish & Game who was present as the State of Alaska Representative.[34]  Mr. Regelin inquired about the standard for considering a request for a special action.  The Chairman directed the question to Ken Lord, one of two solicitors in attendance.  Mr. Lord explained that the special action regulations required the Board to find  "extenuating circumstances" in order to proceed.[35]  Chairman Fleagle then asked Doug McBride to provide the staff's analysis of the request.  The Board heard at length from Mr. McBride, who summarized and discussed the written information which had been made available to the Board members.  Questions from Board members were acknowledged by the Chairman and addressed by the staff and counsel during this portion of the meeting.[36]

Information potentially relevant to the topic of extenuating circumstances included in the written materials summarized by Mr. McBride showed that the residents of Ninilchik had been denied access to any subsistence fishery on the Kenai Peninsula since 1952, although subsistence fisheries were provided elsewhere within the Cook Inlet area.  Although the federal government had been managing subsistence harvests since 1990, the Board had not provided any subsistence fishery for the rural residents of the Kenai Peninsula,[37] but it must be recognized that a substantial amount of the delay

---

[32]*Id.* at p. 6.

[33]*Id.* at p. 8.

[34]*Id.* at p. 1.

[35]*Id.* at p. 9.

[36]*Id.* at pp. 10 - 29.

[37]*Id.* at pp. 13-15.

Case 3:06-cv-00213-HRH   Document 18   Filed 09/20/06   Page 6 of 17

was attributable to the need to resolve the question whether navigable waters were "public lands" within the meaning of ANILCA, an issue not finally decided until 2001.[38]

Following a short recess, the Chairman invited comments from members of the public who had signed up to testify. Remarks were made by John Sky Starkey, an attorney for Ninilchik Traditional Council; Warren Olson representing the Alaska Outdoor Council; Steven Dougherty, from the State of Alaska's Department of Law; and Ron Rainey, Chairman of Kenai River Sportfishing.[39] Mr. Starkey emphasized the cultural importance of subsistence activities by referencing the affidavit of Robert Wolfe which had been presented to the Southcentral RAC. Mr. Olson stated that he opposed the proposal because it would give some Alaskans a fishing opportunity not available to all Alaskans. Mr. Dougherty read a portion of 50 C.F.R. § 100.19 which indicates that extenuating circumstances include such things as changes in resource abundance or unusual conditions affecting harvest opportunities that could not have been anticipated. Mr. Rainey stated that he objected to the failure to involve the local government, the Kenai Peninsula Borough, in the process.

Following the public comments, the Board heard the State of Alaska's position from its representative, Wayne Regelin of the Alaska Department of Fish & Game: "We just don't feel like there's any kind of emergency or a special need right now. And there certainly isn't any crisis for lack of opportunity to take fish. So we would urge you to slow down and take this up in the normal cycle."[40] Next, Dr. Glenn Chen from the Bureau of Indian Affairs advised the Board that the Interagency Staff Committee supported the proposal noting that 2006 return of coho salmon to the Kasilof was sufficient to support the requested dip net fishery.[41] Finally, the Board heard from Tom

---

[38]*John v. United States*, 247 F.3d 1032 (9th Cir. 2001) (en banc).

[39]*Id.* at pp. 30-33.

[40]*Id.* at p. 34.

[41]*Id.* at pp. 34-35.

-7-

Carpenter, Vice-Chair of the Southcentral RAC, who read the regional advisory council's unanimous recommendation in favor of creating the temporary subsistence fishery.[42]

After hearing from Mr. Carpenter, Chairman Fleagle, stated that any motion to be made at the meeting should be "to adopt, reject or modify the Council's recommendation."[43] Board Member Niles Cesar made a motion to adopt the Southcentral RAC's recommendation, and the motion was seconded by Board Member Steve Kessler.[44] Chairman Fleagle then entertained discussion by the Board. Following a lengthy discussion,[45] Board member Cesar called for the question, but Chairman Fleagle interjected his own comment that he thought the matter might be deferred pursuant to "Section (c)," whereupon he quoted a portion of 50 C.F.R. § 100.19(c).[46] Chairman Fleagle's comment elicited a negative response from Board Member Cesar, at which point Chairman Fleagle recognized the question and called for a vote of the Board on the motion to adopt the recommendation made by the Southcentral RAC.[47] Board Members Cesar, Kessler, and Gottlieb voted to adopt the recommendation; Board Members Edwards, Oviatt, and Fleagle voted against the motion. The motion failed to carry on the tie vote.[48] The vote constituted final action by the Board on the recommendation to implement the temporary coho subsistence fishery.[49]

Because the Board did not make specific findings nor set forth the reasons for its decision in writing, the court must glean the factual basis and reasons for the Board's

---

[42] *Id.* at pp. 35-36.

[43] *Id.* at p. 36

[44] *Id.* at p. 37.

[45] *Id.* at pp. 37-51.

[46] *Id.* at pp. 51-52.

[47] *Id.* at p. 52.

[48] *Id.* at p. 53.

[49] *Id* at p. 57, ll. 28-35.

-8-

decision from the transcript of the September 5 meeting. Chairman Fleagle explained the reasons why he planned to cast a negative vote at some length in the following words:

> I like what Gary said about the intent of the proposed action to open this subsistence fishery on the Kasilof, I don't have a problem with that at all. I think that that's a great move given the new customary and traditional finding for Ninilchik. But, I, too, have a problem with process, and this is probably a carryover from my State Board of Game days, in just being a real–trying to be real fair to as many affected user groups as possible, to stick to an established process that the public knows and is aware of and is used to for promulgating regulations.
>
>        \*   \*   \*
>
> [M]y objection is not against the request as written, but the timeliness and the process, and what I would prefer to do as it does spell out further in [50 C.F.R. § 100.19(c)], that the Board could defer this proposal to its regular regulatory cycle, and that would be my preference. It would allow the process to work. I know that we have argument that we do have an extenuating circumstance that the tribe did not know that they would be given a positive C&T, that this fisheries [sic] would be available to them for this year and I recognize that argument. But on the other hand we do have a history of no subsistence fishery on the Kenai Peninsula since 1952 and we've only been managing fisheries on the Federal level since 1999 and that's when the tribe has been trying to get a subsistence season open, so we have a long history of not having this fishery. I personally don't see the harm in foregoing one more regulatory opportunity, one more year to allow an established process to work.[50]

Board Member Oviatt's explanation of why he planed to vote against the recommendation was terse. He stated that because "our annual cycle maximized public participation" he would prefer to deal with the request "under the annual regulatory process."[51]

---

[50]*Id.* at pp. 46-47.

[51]*Id.* at p. 48.

-9-

Board Member Edwards spoke at some length about why he would was not going to vote in favor of the recommendation. His position is captured in the following comments:

> I recognize that this has been a long time coming, and, again, I think it is an excellent proposal, and I said I think it's a very modest proposal and I think it would be a good start to provide a fishery that certainly I think this Board has agreed is long overdue, but I don't feel that there are, you know, extenuating circumstances out there that would say that we have to do this at this time.
>
> * * * This is not the process that we would prefer because it has moved very quickly. It came in, it went quickly through the RAC and now, you know, we're hearing the–we made the decision last week that we were going to take this up, you know, the day after a three day holiday, really, I don't think [this] has provided the public an adequate opportunity to address this issue.
>
> And in saying that, you know, I don't feel that there are, you know, the extenuating circumstances . . . ."[52]

## III. PERTINENT LEGAL STANDARDS

The court examines challenges to administrative agency action pursuant to the APA.[53] Under the APA, agency decisions may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[54] "Review under this standard is narrow, and the reviewing court may not substitute its judgment for that of the agency."[55] However, the agency must articulate a rational connection between the facts found and the conclusions reached. The reviewing court may reverse under the arbitrary and capricious standard "only if the agency has relied on factors that Congress has not intended to consider, has entirely failed to consider an important aspect of the problem, or has offered an explanation for that decision that runs counter to the

---

[52] *Id.* at p. 40.

[53] *Earth Island Inst. v. U.S. Forest Service*, 442 F.3d 1147, 1156 (9th Cir. 2006).

[54] 5 U.S.C. § 706(2)(A).

[55] *Earth Island*, 442 F.3d at 1156.

evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

Before awarding relief in the form of an injunction, the court must consider the plaintiff's prospects for success and the relative balance of hardships. As the Ninth Circuit has put it: "There are essentially two factors for a district court to consider before ruling on a motion for a preliminary injunction: 'The likelihood of the plaintiff's success on the merits; and the relative balance of potential hardships to the plaintiff, defendant, and public.'"[56]

Plaintiffs are entitled to a preliminary injunction if they show either: "(1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) the existence of serious questions going to the merits and the balance of hardships tipping [sharply] in [their] favor."[57] "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases."[58] Under the last part of the alternative test, "even if the balance of hardships tips decidedly in favor of the moving party, it must be shown as an irreducible minimum that there is a fair chance of success on the merits."[59] There is one additional factor the court must weigh. "In cases such as the one before us in which a party seeks mandatory relief that goes well beyond maintaining the status quo *pendente lite*, courts should be extremely cautious about issuing a preliminary injunction."[60] Mandatory preliminary relief should not be issued unless the law and facts clearly favor the moving party.[61]

---

[56] *Native Village of Quinhagak v. United States*, 35 F.3d 388, 392 (9th Cir. 1994) (quoting *State v. Native Village of Venetie*, 856 F.2d 1384, 1389 (9th Cir. 1988)).

[57] *Id.* (internal quotation and citation omitted)

[58] *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1155 (quoting *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2001).

[59] *Martin v. International Olympic Committee*, 740 F.2d 670, 675 (9th Cir. 1984).

[60] *Id.*

[61] *Stanley v. University of Southern California*, 13 F.3d 1313, 1320 (9th Cir. 1994).

## IV.  DISCUSSION

The decision plaintiffs ask the court to set aside in order to award injunctive relief is the Board's September 5, 2006 decision not to approve the Southcentral RAC's recommendation to create the temporary subsistence fishery requested by the Ninilchik Traditional Council.  In § 805(a)(3)(D) of ANILCA,[62] Congress authorized regional advisory councils to make recommendations in annual reports on how to implement subsistence uses and needs within the region served by the council.  The recommendation at issue here is not one which was made in the Southcentral RAC's annual report.  However, defendants do not contend that regional advisory councils are foreclosed from making recommendations in addition to those set out in annual reports.[63]  As defendants point out, the Secretary has promulgated regulations which apply to the consideration of requests for action outside the annual regulatory process.[64] The court agrees that adopting a regulation permitting a regional advisory council to make recommendations in addition to those in an annual report is consistent with a reasonable interpretation of the statute which may be considered to have set a minimum standard–annual recommendations based on an annual process–without prohibiting a regional advisory council from presenting a recommendation outside the annual cycle.

The Secretary, and hence the Board, has been directed by Congress to employ specific criteria when considering recommendations from a regional advisory council relating to the subsistence preference created by § 804 of ANILCA which are made in the contemplated annual reports from the councils:

> The Secretary may choose not to follow any recommendation which he determines is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of subsistence needs.  If a

---

[62]16 U.S.C. § 3115(a)(3)(D).

[63]Opposition, doc. 13 at p. 13, n.9.

[64]50 C.F.R. § 100.19.

-12-

recommendation is not adopted by the Secretary, he shall set forth
the factual basis and the reasons for the decision.[65]

Plaintiffs contend that because the Board's articulated reason for not accepting Southcentral RAC's recommendation, namely that the Board would prefer to address the issue in the annual regulatory process in order to provide for more public input, is not a reason listed in § 804, the decision must be set aside. Plaintiffs are correct that the record before the court shows that the Southcentral RAC's recommendation met the statutory criteria set forth in § 804.[66] First, from the comments of all Board Members, none of whom found any fault with the proposal itself, it must be concluded that the proposal was supported by substantial evidence. Second, the recommendation did not violate "recognized principles of fish and wildlife conservation." The proposal was consistent with management of the resource. Third, approval of the recommendation could not have been detrimental to subsistence needs. Indeed, quite the contrary was true. Approval would have created the first "real" subsistence fishery[67] on the Kenai Peninsula in over fifty years.

To avoid the problem inherent in a Board decision that does not rely on the relevant statutory factors, defendants take the position that the reason given is legitimate under the regulations which pertain to recommendations made outside the annual cycle. Defendants contrast the provisions of 50 C.F.R. § 100.18 and 50 C.F.R. § 100.19. The court agrees with defendants that the former regulation applies to the normal annual cycle of regulatory activity, while the latter applies in situations where, as here, Board action is sought outside the normal regulatory cycle.

---

[65]Section 805(c) of ANILCA, 16 U.S.C. § 3115(c).

[66]*See also* 50 C.F.R. § 100.18(a)(4).

[67]The State had not created a "substistence" fishery on the Kenai Peninsula so when the federal government fell heir to the responsibility to enforce subsistence rights on the Peninsula, it could not, as it did elsewhere, simply adopt an existing set of state subsistence regulations as a starting point. Instead, it initially adopted a subsistence fishery on the Peninsula open to all rural Alaskans with harvest limitations essentially mirroring the States' sport fishery regulations for the area. Transcript at pp. 14-15.

-13-

The differences between § 100.18 and § 100.19 are of critical significance. Under 50 C.F.R. § 100.18(a)(4), the Board's standard for evaluating the recommendation of a regional advisory council is highly deferential: "The Board may choose not to follow any recommendation which the Board determines is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of subsistence needs." Section 100.18(a)(4) further requires that if a regional advisory council's recommendation is not adopted by the Board, "the Board shall set forth the factual basis and the reasons for its decision in writing to the Regional Council." In contrast, § 100.19, which is applicable to special requests and temporary changes, does not set forth such a standard for the Board's evaluation of a regional advisory council's recommendation. Subsection 100.19(e) provides instead that "[a]fter consultation with the State, the appropriate Regional Advisory Council(s), and adequate notice and public hearing, the Board **may** make or direct a temporary change. . . ."[68] In other words, the Board has discretion to choose whether to act on a RAC recommendation for a temporary change, and that discretion is not tethered to the same standard applicable to RAC recommendations made in the course of the annual regulatory process.

Section 100.19 is not a model of clarity. There is uncertainty whether a request for a temporary action such as the Ninilchik Traditional Council sought and the Southcentral RAC recommended should be analyzed exclusively under § 100.19(e), or whether such a request can only be approved if the Board finds there are "extenuating circumstances," a standard set forth in § 100.19(c). Subsection (c) provides: "The Board will accept a request for a change in seasons, methods and means, harvest limits, and/or restrictions on harvest only if there are extenuating circumstances necessitating a regulatory change before the next annual Subpart D proposal cycle."[69]

---

[68] 50 C.F.R. § 100.19 (e) (2005) (emphasis added).

[69] 50 C.F.R. § 100.19(c).

-14-

The recommendation before the board did amount to a request to change the methods and means of the subsistence harvest.[70]

The transcript shows that the Board was advised at the outset of the meeting that it was proceeding on the basis that extenuating circumstances requirement was applicable.[71]  The comments of some of the Board Members during the meeting generally bear out that the Board was proceeding on the basis that extenuating circumstances were required for approval of the special action request.[72]  On the other hand, solicitor Goltz responded to a Board inquiry by first saying that the Board did need to find extenuating circumstances, but then saying he would favor an interpretation that allowed subsection (e) to stand alone.[73]

The regulation says: "Extenuating circumstances include unusual and significant changes in resource abundance or unusual conditions affecting harvest opportunities that could not reasonably have been anticipated and that could have significant adverse effects on the health of fish and wildlife populations or subsistence uses."  Assuming for the sake of argument that the Board was required to find that "extenuating circumstances" were present, the court is unable to conclude that the Board's decision that they were not present was arbitrary, capricious, an abuse of discretion, or illegal. The argument that there were extenuating circumstances is that there was no subsistence use fishery for the residents of Ninilchik on the Kasilof River despite the fact

---

[70]This is illustrated graphically in doc. 6, Ex. N which shows the staffs' pen and ink changes to the regulations which might implement Ninilchik Traditional Council's special request.

[71]Transcript at p. 9, statement of solicitor Lord indicating the "extenuating circumstance" request applies to special action requests such as the one before the Board.

[72]Board Member Edwards explained that he thought extenuating circumstances are lacking.  Transcript p. 40; Board Member Oviatt stated that he doubts there are "circumstances here that meets the threshold of special consideration." *Id.* p. 41.  Board Member Gottlieb advised that she thought extenuating circumstances were present. *Id.* p. 42.  Board Member Kessler asked for guidance on how to deal with the requirements of subsection (c) and how extenuating circumstances could be found. *Id.* p. 43.  Chairman Fleagle indicated that there was an argument for extenuating circumstances, but he rejected it. *Id.* p. 47.

[73]*Id.* pp. 43-44.

Case 3:06-cv-00213-HRH   Document 18   Filed 09/20/06   Page 15 of 17

that their customary and traditional use of the Kasiloff River had been recognized in a regulation published in March of 2006.[74]  That is true, but it is hardly something that was not foreseen when the regulation was published.  Rather, it is something that will have to be addressed by the Board in its annual regulatory cycle.

Assuming that the extenuating circumstances requirement under § 100.19(c) were not applicable, plaintiffs' request for injunctive relief would depend on a showing that the Board violated the standards of § 100.19(e).  That regulation gives the Board discretion to adopt temporary changes.  The Board "may" make such changes.  Unlike ANILCA and the companion regulation dealing with regulatory changes that come up in the regular annual cycle, the regulation applicable to temporary changes is silent as to the criteria which the Board must employ.  In the absence of any criteria by which to measure the Board's exercise of discretion, the court cannot say that the failure to implement the requested change was arbitrary, capricious or a violation of law.

Plaintiffs are seeking a mandatory injunction, so their request for relief is subject to a higher degree of scrutiny that would otherwise be the case.  The court may grant mandatory injunctive relief only if the law and facts clearly favor the moving party.[75] With respect to setting aside the Board's action of September 5, 2006, plaintiffs have failed to carry that heavy burden.

Viewing the larger picture, there can be no doubt that plaintiffs have been shabbily treated for more than fifty years by those responsible for fish and game management on the Kenai Peninsula.  It is also clear that despite plaintiffs' diligent efforts, the Board has been slow to recognize and enforce their rights under ANILCA.  However, the pall cast by past actions is inadequate to show that in the particular instance brought to the court's attention by the motion at docket 4, the Board acted unlawfully.  In these circumstances, the court is powerless to provide plaintiffs the relief

---

[74]The Board's January 2006 decision was published in the Federal Register on March 29, 2006.  71 Fed. Reg. 15574.

[75]*Stanley*, 13 F.3d at 1320.

-16-

they seek.[76]  Of course, a failure to address a subsistence use fishery on the Kasilof River for residents of Ninilchik in the next annual regulatory cycle probably would be arbitrary, capricious, and in violation of ANILCA, but that is not before the court at this time.

### V.  CONCLUSION

For the reasons set out above, the motion at docket 4 is **DENIED**.

DATED at Anchorage, Alaska, this 20th day of September 2006.

/s/
JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[76]*Safari Aviation, Inc. v. Garvey*, 300 F.3d 1144, 1150 (9th Cir. 2002).

-17-